# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 8174 | **DATE** | 9/29/2004 |
| **CASE TITLE** | James Gumm vs. James Flickenger et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

> Motion to Dismiss [20-1] and Motion to Dismis [14-1]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motion to dismiss Plaintiff's entire complaint on abstention grounds [14-1] is DENIED. Defendants' motion to dismiss on Count I on qualified immunity grounds [20-1] is GRANTED IN PART and DENIED IN PART. Plaintiff's Equal Protection and First Amendment Retaliation claims on grounds of qualified immunity is DENIED. Defendants' motion to dismiss Plaintiff's Due Process, Free Exercise, and Freedom of Association claims on grounds of qualified immunity is GRANTED. Plaintiff's Due Process, Free Exercise, and Freedom of Association claims are DISMISSED.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | number of notices | |
| | No notices required. | | | | | |
| | Notices mailed by judge's staff. | | | | SEP 3 0 2004 | |
| | Notified counsel by telephone. | | | | date docketed | |
| x | Docketing to mail notices. | | | | | 35 |
| | Mail AO 450 form. | | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | date mailed notice | |
| kt/lc | courtroom deputy's initials | | Date/time received in central Clerk's Office | | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
SEP 3 0 2004

JAMES GUMM, Individually and in his
Capacity as the Milton Township Assessor )

    Plaintiff, )

                  v. )

JAMES FLICKENGER, BARBARA
MURPHY, O. CHRISTOPHER HEIDORN,
Individually and in Their Capacities as
Milton Township Trustees, RON SMITH,
CAROL SCHOLL, AND JAMES PHILLIPS

    Defendants. )

No. 03-C-8174

HONORABLE DAVID H. COAR

SEP 3 0 2004

## MEMORANDUM OPINION AND ORDER

Before this Court are two motions to dismiss related to the complaint filed by James Gumm ("Gumm" or "Plaintiff"). In the first, defendants James Flickenger, Barbara Murphy, O. Christophertopher Heidorn, Ron Smith, and James Phillips ("Defendants") request that this Court dismiss Plaintiff's entire complaint, pursuant to Fed.R.Civ.P. 12(b)(6), on abstention grounds. In the second, Defendants request that this Court dismiss Count I of Plaintiff's complaint, pursuant to Fed.R.Civ.P. 12(b)(6), on qualified immunity grounds.[1]

Defendants' motion to dismiss Gumm's entire complaint is DENIED. Defendants' motion to dismiss Count I on grounds of qualified immunity is GRANTED IN PART and

---

[1] Phillips has adopted the reasoning in the motion to dismiss Count I submitted by Flickenger, Murphy, Heidorn and Smith. Flickenger, Murphy, Heidorn, and Smith have adopted Phillips' reasoning in his motion to dismiss the entire complaint. For the sake of simplicity, this Court will use the term "Defendants" to refer to all four individuals and decide both motions with reference to all four individuals.

35

DENIED IN PART. Defendants' motion to dismiss is GRANTED with respect to Plaintiff's Due Process, Free Exercise, and Freedom of Association claims. Defendants' motion to dismiss Count I on grounds of qualified immunity is DENIED with respect to Plaintiff's Equal Protection and First Amendment Retaliation claims.

## Factual and Procedural Background

Plaintiff James Gumm first began working in the Milton Township Assessor's office in 1988. ¶8. He started as a deputy assessor and was later elected to the post of Assessor. ¶8. He began his four-year term in 1998, was re-elected, and began his second four-year term in 2002. ¶¶8-9.

As Assessor, Gumm updated the information technology in the Assessor's Office. ¶¶ 10-11. Since early 2002, the total number of employees necessary for the day-to-day operations of the Assessor's office has decreased by half, from 20 employees to 10 employees. ¶13.

When Gumm took office, there was a substantial disparity in residential and commercial assessments. ¶14. A number of commercial properties had either been underassessed or not assessed at all. ¶14. Gumm was particularly concerned about the exemptions and underappraisals that benefitted elected officials. ¶20.

During his tenure, Gumm updated commercial assessments. ¶17. He denied Milton Township Board member James Flickenger four of the five assessment exemptions that Flickenger had been previously given. ¶19. He also denied exemptions to a number of individuals associated with Flickenger and increased the assessments of others associated with Flickenger as much as five times what they had paid in the past. ¶22.

Gumm's moves met with considerable resistance from a number of people, including local and civic political leaders who objected to the assessment corrections. ¶16. Gumm was repeatedly warned by elected officials and political leaders that his reelection would be opposed and efforts would be made to destroy him politically. ¶16.

Flickenger, for example, participated in closed sessions of public bodies, met with members of Gumm's church to discuss the most intimate details of Gumm's life, encouraged disturbances among Gumm's employees, publicly maligned Gumm, and campaigned and voted to deny Gumm the necessary resources to do his job. ¶23.

Ron Smith, a former Milton Township Assessor was employed by Milton Township in another capacity during the events in question, vocalized a strong interest in seeing Gumm removed from office. ¶24. Smith pursued Gumm's removal by meeting with employees from the Assessor's office and encouraging them to pursue claims for disparate treatment of one kind or another. ¶28. In 2000, he met repeatedly with employee Carol Scholl. ¶29. After Gumm took office, Smith and Scholl met several times to discuss the viability of a lawsuit against Gumm that would serve to tarnish his reputation and credibility such that he would be forced to leave office. ¶32. Smith had previously assisted Scholl in pursuing claims for sexual harassment against another individual. ¶30.

In or about August 2000, Scholl came to work wearing a t-shirt that pictured tomatoes and stated "firm." ¶156. She later complained that Gumm touched her shirt and said the word "firm." ¶ 157. Later that day, she met with a local police officer. ¶ 158. She told the officer that she had had a tape recorder in her pocket during a meeting with Gumm and that she wanted to use the recording. ¶158. The officer told her it was illegal. ¶158. When Gumm later

demanded a copy of the tape, she said it she had recorded over it. ¶160. When Scholl was asked for a copy of the tape that had been "taped over" she claimed that it had been destroyed. ¶161.

In late 2000, Scholl and seven other employees in the Assessor's office prepared a claim against Gumm and another Assessor's Office employee, Larry Gage. ¶ 37. In February 2001, Scholl filed a claim with the EEOC alleging, among other things, that she had "felt pressured for dates with Gumm." ¶33. Scholl researched the law on sexual harassment, came to work wearing provocative clothing and a hidden microphone with the intent that he would be provoked into saying or doing something that would support a claim for sexual harassment; and met with other employees in the office to convince them that they were underpaid or unter-utilized on account of their gender. ¶ 35. Scholl's personal files indicate that she and Gumm were "developing a friendship." ¶34.

The complaint was lodged shortly after a meeting in which Township Board member Barbara Murphy advised the complainants on how to craft their complaint so it would be covered by the Township's insurance policy. ¶38. The employees alleged that the Assessor's Office constituted a hostile work environment and Scholl alleged that Gumm was pursuing her for dates. ¶39. The claims were asserted against the Assessor's Office and the Milton Township Board. ¶40.

The Board's retained attorney, Richard Russo, interviewed both the claimants and a number of individuals they identified as witnesses. ¶41. Russo accumulated over two dozen audio cassettes of testimony and a box of documentation regarding claims against Gumm. ¶42. The tapes revealed that many, if not all of the claims against Gumm, were completely lacking in merit or credibility. ¶44. Gumm was not told that many of the claimants had already

-4-

acknowledged during their taped interviews with Russo that the claims filed with the EEOC were lacking in merit. ¶54. Scholl said during her interview that other than one instance, there had been no inappropriate touching.¶ 46. Another witness was among many who testified that she thought the allegations had been fabricated to get Gumm out of office. ¶47.

Gumm was not given access to the tapes during the investigation or its subsequent resolution. ¶43. He lodged complaints with the Township Supervisor and the Township Human Rights Consultant regarding the Board's handling of the investigation. ¶49. Freedom of information requests were made on his behalf. ¶49. He had asked that the counsel retained to represent him provide him with the documents. ¶49.[2]

Before the mediation, Gumm had repeatedly advised his counsel and the other defendants that he believed the evidence would exonerate him and that he therefore had no interest in considering the kinds of settlements that were likely to be discussed at the mediation. ¶52. Gumm vehemently denied any liability and repeatedly asked that the Board and insurer attending the mediation agree with him that the claims should be defended rather than settled. ¶51.

Over Gumm's objections, the Trustees and counsel negotiated a settlement agreement which, in part, provided for the Trustees to exercise some albeit limited authority over the Assessor's office. ¶55. Gumm was ultimately compelled to agree to settlement when one of the insurers advised him that he was placing Township assets at risk by proceeding to trial as the insurers' counsel would not continue to represent him after the mediation. ¶52. Gumm was not

---

[2]The evidence of the investigation, and a later investigation, was not all disclosed to Gumm until early 2003, when a DuPage County Judge compelled production of the tapes and documents that had been withheld from him, along with other materials in possession of Scholl and the Board. ¶ 48.

told that many of the claimants had already acknowledged during their taped interviews with Russo that the claims filed with the EEOC were lacking in merit. ¶54.

The final settlement agreement contained language which Heidorn and other defendants later construed to provide the Township Board with authority over the handling of employee disputes, Gumm, and other related concerns. ¶60.[3]

In late September, 2001, Smith and Phillips attended a private meeting with the Milton Township Board. ¶61. At the meeting, Gumm's situation was discussed. ¶61. Phillips ordered Heidorn, Flickenger, and Murphy to "take care of it." ¶61. In the first week of November, 2001, Heidorn prepared the "bullet memo" which he distributed to members of the Board. ¶62. The bullet memo provided that Gumm would take no part in human resources decisions for a year, and after the year would only do so in consultation with deputy assessor Carol Lofgren and Carol Scholl. ¶63. The memo also stated that Gumm would be prohibited from terminating any employee for any reason; that employees of the Assessor's office would be free to "consult" with Heidorn rather than Gumm regarding the business of the Assessor's Office "without fear of comment or reaction" by Gumm; and that the Trustees would be free to advise the deputy assessor regarding matters involving the Assessor's Office "without interference" by Gumm. ¶63. In exchange for the concessions, the bullet memo provided specific assurance that "Ron [Smith] will cease all over and covert activities designed to undermine" Gumm. ¶64.

---

[3]Gumm later learned that there had been discussions regarding the establishment of a procedure that gave the Board even more authority over the Assessor's office than the procedure that was eventually included in the settlement agreement. ¶57. The second draft of the settlement agreement provided for the Township Board to assume the right to essentially impeach the Assessor if the Board determined that he was "guilty of covered discrimination" and provided that an employee could not be terminated for cause unless that determination was made by Trustees. ¶¶58-59.

On November 8, 2001, the Board held another private meeting. ¶65. All the Board members attended, as did state senator Peter Roskam, and representative Randy Hultgren. ¶65. Smith had previously consulted Hultgren about Scholl's initiation of claims against Gumm. ¶65. Gumm arrived at the meeting, which was held at Heidorn's home, expecting to attend a personal meeting with Heidorn. ¶¶65-66. At the meeting, Gumm was presented with the bullet memo and told to sign it. ¶67. He was told that if he did not sign it, the group would make a concerted effort to ruin him. ¶67. Gumm refused to sign the memo. ¶68.

On November 24, 2001, Gumm went to Phillips' office, expecting to meet with the local party leader in response to a request he had received. ¶70. He found the Board once again in a private meeting, this time with four of its five members present. ¶70. Smith, Roskam, Hultgren, and Phillips were also in attendance. ¶70. At the meeting, Phillips threatened Gumm. ¶71. He told Gumm, "We'll tell you who you can hire and fire." ¶71. He said that if Gumm didn't agree to surrender control of his office in the manner described in the bullet memo, the Board would "ruin" him in the newspapers. ¶71. Phillips demanded that Gumm stop going to the office, so that his presence would not interfere with the Trustees' control over its activities. ¶72. Phillips told Gumm, "No elected official shows up at his office everyday and you're not going to." ¶72. Roskam told Gumm "You're a convicted molester" and that his reputation would be ruined through a smear campaign and other "covert activities" if he refused to sign the bullet memo. ¶73. Gumm refused to comply with the group's demands. ¶74.

In December, 2001, the Township Board held a regular meeting. ¶75. The press was invited to the meeting and local police officers were brought in. ¶77. Gumm, who had received no notice that the meeting would affect either his personal interest or the Assessor's office, did

not attend the meeting. ¶76. At the meeting, a press release prepared by Flickenger was distributed. ¶77. The press release made it clear that the Board had decided to "censure" Gumm and had passed a "Resolution of Censure." ¶77. The release explained that the Board was taking the action so that the voting public would have "information" to use in determining Gumm's fitness to serve as Assessor. ¶77. The Board failed to disclose that there had been a settlement agreement or that it had not found any evidence from its prior investigation from which to conclude that Gumm had engaged in any wrongful conduct. ¶81. Gumm was not presented with the opportunity to present evidence on his own behalf or defend himself in any way, either during the adoption of the Resolution or at the Board meeting where the resolution was presented. ¶¶79-80. Roskam and Hultgren went with Scholl to meet with local reporters and discuss the claims against Gumm. ¶82.

After the passing of the Resolution, Scholl and other employees in the Assessor's Office openly discussed the possibility of staging work slow-downs if the office was not handled in the manner they deemed appropriate. ¶84. They threatened to resort to the Board under the auspices of the Settlement Agreement. ¶84. The Board started openly resisting Gumm's efforts to manage the office by removing the Assessor from the monthly agenda and refusing to add him to the agenda even upon his request, voting to reduce the Assessor's budget at a time when virtually no other aspect of Township government was being reduced in any manner, and continuing to engage in discussion with employees of the Assessor's office regarding their employment status and grievances against Gumm. ¶85. The discussions with employees continued to undermine Gumm's authority and disrupt the day-to-day business of the office. ¶85. Gumm's pastor was

contacted and told Gumm was unstable. ¶83. Two of the deacons in his church were asked to meet with him to discuss his "problem" and need for psychological and spiritual assistance. ¶83.

In January 2002, a few weeks after the first story regarding the resolution appeared in the newspapers, Scholl provided Heidorn with a new set of claims regarding Gumm's conduct based on Gumm's alleged retaliation against her and other employees for previously bringing forth claims against him. ¶86. Heidorn asked Scholl to prepare a more "official" sounding document, reviewed the variations of this document in April and May, and then shared the document with other members of the Board in August, 2002. ¶87. Neither Heidorn nor Scholl told Gumm or the HR Coordinator for the Assessor's Office about the claims, despite being required to do so under the settlement agreement. ¶88.

On September 5, 2002, counsel for Scholl sent a written demand to Gumm, claiming that he had engaged in retaliatory conduct against Scholl in violation of both the mediation agreement and his common law duties as an employer. ¶89. Gumm agreed to an investigation of Scholl's new claims, but the Board did not initiate an investigation in compliance with the settlement agreement. ¶90. The Board did not consult the outside attorney who had been designated under the Settlement Agreement to handle such matters. ¶91. Instead, Heidorn retained the services of attorney Kevin Gustafson and subsequently paid his fees. ¶¶91-92. Heidorn told Gustafson that he thought Gumm was guilty as charged before the investigation began. ¶92.

Gumm, who objected to Gustafson's retention and did not consent to the Board making any determinations with respect to his innocence or guilt, demanded that the Township Supervisor cease and desist from any further "investigation" and any further involvement in the business of the Assessor's office. ¶93. The Board consulted with counsel, and then decided to

stay any further action. ¶ 94. Gumm then demanded that the Board provide him and Scholl with copies of the tapes and documentary record from the investigation of Scholl's claims, as required under the original settlement agreement. ¶95. The Board refused, Gumm file suit in DuPage County Court, and the Court ordered production of the documents. ¶¶ 96-97. Through his investigation, Gumm learned that Scholl had a "basement full" of documents she had taken from the Assessor's Office. ¶100. Scholl also had documents written by Smith regarding the claims against Gumm, including a document which stated that if Gumm was elected "we are stuck with him for five years!" and asked "Can he be removed from office it if is proven that he is guilty of sexual misconduct, discrimination and intimidation, etc.?" ¶101.

Scholl abandoned the mediation process in relation to her retaliation claim. ¶99. Smith eventually filed his own retaliation claim in February 2003. ¶102. Smith also continued to seek out ways to continue threatening, cajoling, and berating those who tried to work with Gumm. ¶103. He threatened employees with scriptural references to God's wrath. ¶103.

A few months ago, Gumm received another notice from the elders of his church, requesting that he "temporarily step-down" from his position as church usher until his problems, including the dispute between him and Flickenger, are resolved. ¶105.

Plaintiff filed this complaint in federal court on November 14, 2003.


## Legal Standard for a Motion to Dismiss

Under FRCP 8(a), a complaint generally need only set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Leatherman v. Tarrant County Narcotics Unit, 507 U.S. 163, 168 (1993). In reviewing a motion to dismiss for failure to state a claim, the

court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in favor of the plaintiff. See Ameritech Corp. v. McCann, 297 F.3d 582, 585 (7th Cir. 2002). If a complaint fails to allege a necessary element required to obtain relief, however, dismissal is in order. See R.J.R. Services, Inc. v. Aetna Casualty and Sur. Co., 895 F.2d 279, 281 (7th Cir. 1989). A complaint "must at least include the operative facts upon which a plaintiff bases his claim." Lucien v. Preiner, 967 F.2d 1166, 1168 (7th Cir. 1992). When reviewing the complaint, only factual allegations will be considered, and legal conclusions which may be alleged are not binding upon the court. Reichenberger v. Pritchard 660 F.2d 280, 282 (7th 1981) (citing City of Milwaukee v. Saxbe, 546 F.2d 693, 704 (7th Cir. 1976)).

When defendants raise qualified immunity as an affirmative defense on a motion to dismiss, the plaintiff bears the burden of defeating such a defense. See Sparing v. Village of Olympia Fields, 266 F.3d 684, 688 (7th Cir. 2001). When determining whether to grant defendants' qualified immunity, the Court will proceed by first determining "whether the facts, taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right." McGreal 368 F.3d at 682, citing Saucier v. Katz, 533 U.S. 194, 201 (2001). If it is shown that defendants' conduct did indeed violate a constitutional right, the Court must then determine "whether the right in question was clearly established at the time of the violation." McGreal 368 F.3d at 683, citing Saucier, 533 U.S. at 201. When completing the second step of the qualified immunity analysis, "[t]he salient question is not whether there is a prior case on all fours with the current claim but whether the state of the law at the relevant time gave the defendants fair warning that their treatment of the plaintiff was unconstitutional." McGreal, 368 F.3d at 683 (internal citations omitted).

-11-

## Analysis of Defendants' Motions to Dismiss

**Motion to Dismiss Entire Complaint on Abstention Grounds**

In terms of abstention doctrine, federal courts have a "virtually unflagging obligation...to exercise the jurisdiction given to them." Clark v. Lacy, 376 F.3d 682, 685 (7th Cir. 2004) (citations omitted). A federal court may stay a suit in exceptional circumstances when there is a concurrent state proceeding and the stay would promote "wise judicial administration." Id.

Before abstaining as Defendants request, this Court must determine whether the concurrent state and federal actions are actually parallel. Clark v. Lacy, 376 F.3d at 684. The "mere fact" that an action is pending in state court is ordinarily no bar to parallel federal proceedings. LaDuke v. Burlington N.R.R. Co., 879 F.2d 1556, 1558 (7th Cir. 1989). Suits are parallel when "substantially the same parties are contemporaneously litigating substantially the same issues in another forum. Interstate Material Corp. v. City of Chicago, 847 F.2d 1285, 1288 (7th Cir. 1988)(quoting Calvert Fire Ins. Co. v. American Mut. Reinsurance Co., 600 F.2d 1228, 1229 n.1 (7th Cir. 1979)).

Defendants concede that Plaintiff's current state court litigation is not grounds for abstention, and attempt to argue that the Court abstain because Plaintiff did at one point have a complaint in state court that could have required abstention. Defendants' suggestion that this Court abstain based on an analysis of a now-moot claim could lead to the perverse result of requiring plaintiffs to keep from voluntarily dismissing meritless claims in state courts for fear they will be penalized for the dismissal in federal court. Defendant's abstention argument is without merit and does not support a motion to dismiss.

Defendants' motion to dismiss the entire complaint on abstention grounds is DENIED.

-12-

## Motion to Dismiss Count I on Qualified Immunity Grounds

Given that Defendant's motion to dismiss based on the abstention doctrine has failed, this Court must now review the motion to dismiss Count I of the claim–the portion brought under §1983–and determine whether Defendants are entitled qualified immunity. Plaintiff raises claims under both the Fourteenth Amendment and the First Amendment in his quest for §1983 relief.

## Fourteenth Amendment Claims

### A. Equal Protection

Plaintiff alleges that he was the object of an official campaign initiated out of spite and powered by sheer malice. As a result, at this stage of the proceedings, Plaintiff has sufficiently alleged that he was denied equal protection under the law.

After Plaintiff was elected Assessor, he instituted fairly radical changes in the Assessor's Office: he not only reduced staffing needs by half, he also increased the assessment charges of a variety of politically well-connected opponents. Plaintiff's conduct–and his continued defense of his conduct in conversations with important political figures–led Defendants to craft a campaign against him, according to his complaint.

In an attempt to wrestle power away from Plaintiff, Defendants fostered a false claim of sexual harassment, made certain the claimant involved both the Assessor's Office and the Trustees so that they could involve themselves in the resolution of the claim, and then forced Plaintiff to accept a settlement agreement that gave them an increased role in the management of the Assessor's Office.

In order to formulate and carry out their plans, Defendants held a series of meetings focused on retaliating against Plaintiff. They eventually created a "bullet memo" that stripped Plaintiff of a significant amount of authority and required him to apologize to all the employees of the Assessor's Office for the charges the Defendants had trumped up. When Plaintiff refused to sign the memo, they redoubled their efforts and threatened to launch a smear campaign against him.

In response to Plaintiff's continued refusal to sign the memo, Defendants on the Milton Township Board held a public meeting in December 2001 where they distributed a press release stating that the Board had passed a "Resolution of Censure" against Plaintiff and would not tolerate sexual harassment by elected officials. Some defendants spoke to reporters regarding the release.

A few weeks after the first story appeared in the newspapers, Defendants began working on a retaliation claim against Plaintiff. Scholl pursued the claim but later abandoned it after a DuPage County Judge ordered that certain documents be made available to Plaintiff.[4]

Equal protection violations can occur when "action taken by the state, whether in the form of prosecution or otherwise, was a spiteful effort to 'get' [the plaintiff] for reasons wholly unrelated to any legitimate state objective." Esmail v. Macrane, 53 F.3d 176, 179 (7th Cir. 1995). In Esmail, for example, the plaintiff liquor store owner was denied a liquor license because the mayor and other city officials had developed a "deep-seated animosity" towards him. Esmail eventually got his liquor license–and incurred $75,000 in legal expenses–as a result of state court

---

[4]Included in the documents that Plaintiff eventually received was an old document noting that if Gumm was re-elected, "we are stuck with him for five year!" and asking if he could be removed from office if it was proven that he was guilty of sexual misconduct or discrimination.

litigation. In federal court, Esmail alleged that he was treated unequally in the licensing process solely because of a vindictive campaign against him. The Seventh Circuit agreed, holding that he did raise a claim under the Equal Protection Clause. See also Olech v. Willowbrook, 160 F.3d 386, 387 (1998) (affirming that a spiteful effort by the state to "get" plaintiff for reasons wholly unrelated to any legitimate state objective could violate the Equal Protection Clause.).

The facts Plaintiff alleges, and the reasonable inferences drawn from those facts, support that claim that Defendants' actions against Plaintiff were in violation of the Equal Protection clause. Given that the actions in question took place after the Seventh Circuit decided Esmail and Olech, Defendants had fair warning that their treatment of Plaintiff was unconstitutional. As a result, Plaintiff at this stage in the proceedings has satisfied his burden in defeating Defendants' qualified immunity defense.

The actual facts of Plaintiff's case may not support an application of Esmail or Olech. At this stage, however, Plaintiff has alleged that he was the subject of a vindictive campaign and was subjected to irrational treatment by the state because of it. Consequently, Defendants' motion to dismiss Plaintiff's Equal Protection claim on qualified immunity grounds is DENIED.

**B. Due Process**

Liberally construing plaintiff's complaint, he appears to be arguing that the Board's adoption of its Resolution of Censure caused him some form of injury in violation of the Due Process Clause. Plaintiff does not, however, put forth a cognizable injury under the Due Process Clause.

Plaintiff does not present an injury related to a denial of substantive due process. He makes passing reference to privacy rights in his complaint but does not allege sufficient facts

-15-

to enable this Court to understand what actions defendants have taken in relation to Plaintiff's right to privacy.

Plaintiff also attempts to plead that he was denied procedural due process. At best, Plaintiff's complaint can be read as arguing that he suffered as a result of the Board's adoption of its Resolution of Censure but he fails to set forth facts indicating that he suffered any deprivation of liberty or property.

In order to raise a cognizable Due Process claim, Plaintiff must allege an actual deprivation of his rights as a result of Defendants' actions. See Reichenberger v. Pitchard, 660 F.2d 280, 285 (7th Cir. 1981)("The mere possibility of remote or speculative future injury or invasion of rights will not suffice." (internal citations omitted)). Based on the facts asserted, it is unclear to this Court how Plaintiff is alleging that either his liberty or property interests have been affected by Defendants' actions.

Reputation is not "property" or "liberty" within the meaning of the due process clauses of the Fifth and Fourteenth Amendments. Colaizzi v. Walker, 812 F.2d 304, 307 (7th Cir. 1987) (citing Paul v. Davis, 424 U.S. 693, 711-12 (1976)). Simple defamation is not enough to evoke the protection of the Due Process Clause. Townsend v. Vallas, 256 F.3d 661, 669 (7th Cir. 2001)(internal citations omitted).

To implicate a liberty interest, charges of defamation must be coupled with the alteration of a legal status, such as the loss of an employment position. Id. In this case, Plaintiff was not fired and was actually re-elected after he was publicly censured. Based on his complaint, he has not alleged any alteration in his legal status as a result of defendants' actions.

To implicate a property interest, Plaintiff must allege a direct or indirect economic harm that could establish an actual deprivation of property. See Bordelon v. Chicago School Reform Bd. of Trustees, 233 F.3d 524, 530 (7th Cir. 2000). The deprivation must be more than de minimis. Id. Furthermore, "the loss of professional satisfaction and damage to personal relationships, reputation, and health, though painful to the plaintiff, are plainly not pecuniary injuries." Id. at 530. Plaintiff's complaint does not allege facts to support the proposition that he suffered direct or indirect economic harm as a result of the Resolution. He does not indicate that his salary was altered in any way. He was not fired, and in fact was re-elected at the apex of Defendants' efforts to ruin him.

Plaintiff's complaint does not give rise to facts that indicate that the Resolution actually had any effect on Gumm's liberty or property interests. If indeed the Resolution did have any significant effect on Gumm's interests, he has not sufficiently pled facts in support of such a conclusion here. See Reichenberger v. Pitchard, 660 F.2d at 285-286 (noting that a plaintiffs did not allege a constitutional injury based on the Due Process Clause when their activities were not interrupted or curtailed.).

As Plaintiff has not alleged the violation of a constitutional right, this Court need not carry out the second step of qualified immunity analysis. Defendants' motion to dismiss Plaintiff's Due Process claims on grounds of a qualified immunity defense is GRANTED. Plaintiff's Due Process claims are DISMISSED.

**First Amendment Claims**

**A. Free Speech Claim**

-17-

Bearing in mind that the facts are to be construed in favor of the Plaintiff, it is reasonable to infer that he was the subject of retaliatory action taken by Defendants because he spoke out against inappropriate assessments levied on powerful political figures, removed the inequitable assessment scheme in place, and refused to sign a document that would have redistributed power from an elected official to others who were not elected to the office of Assessor. Consequently Plaintiff does, at this stage of the proceedings, present a possible First Amendment Retaliation claim.

In order to prevail on a retaliation claim, the plaintiff must establish that his speech was a matter of public concern and that his speech played at least a substantial part in the employer's decision to take an adverse employment action against him. See McGreal v. Ostrov, 368 F.3d 657, 672 (7th Cir. 2004).

Defendants' attempts to manipulate the assessments–and therefore public revenue–is a matter of public concern. See id., 368 F.3d at 673. The bullet memo arguably was intended to lead to a radical redistribution of power: the document was meant to wrestle power away from Gumm as an elected official and consequently away from the majority that voted for him.

Adverse employment actions are broadly defined in the Seventh Circuit. See e.g. Spiegla v. Hull, 371 F.3d 928, 941 (7th Cir. 2004) ("a § 1983 case does not require an adverse employment action within the meaning of the antidiscrimination statutes...Rather, '[a]ny deprivation ... that is likely to deter the exercise of free speech ... is actionable'..." (citations omitted)). See also Bart v. Telford, 677 F.2d 622, 624 (7th Cir. 1982) (explaining that minor harassment, even as seemingly inconsequential as mocking an employee for bringing a birthday cake to the office, may be sufficient to deter the exercise of First Amendment rights)). Viewing

the facts in the light most favorable to the Plaintiff, it is possible that the invasive and extensive investigations into his office, the purposeful disruption of his workforce, and the unnecessary reallocation of his budget could be seen as adverse employment actions orchestrated by Defendants.

If a public employee carries his burden of showing that her speech was related to a matter of public concern and that the speech played a significant part in the employer's decision to take adverse action against her, then defendants can prevail only if they can prove either that the government's interest as an employer in providing efficient services outweighs the plaintiff's First Amendment interests, or that they would have disciplined plaintiff even in the absence of his speech. See McGreal, 386 F.3d at 672. The *Pickering* analysis, focusing on whether the government can prove that the interest of the employee as a citizen in speech is outweighed by the interest of the government employer in promotive effective and efficient public service, is highly fact-specific. Id. at 676, (citing Delgado v. Jones, 282 F.3d 511, 517 (7th Cir. 2002), for the proposition that "the *Pickering* balancing test can seldom be done on the pleadings alone and in most cases will be possible only after the parties have had the opportunity to conduct discovery."). Based on the pleadings in this case, the question of whether Defendants' actions outweighed Plaintiff's interest in speech cannot yet be resolved.

Given that Plaintiff has sufficiently alleged that Defendants' conduct violated an established constitutional right, this Court must determine whether the right in question was clearly established at the time of the violation. In McGreal, the Seventh Circuit analyzed the state of the law regarding retaliation for speech on matters of public concern, citing several cases that showed it had been "well-established for many years that a public employer may not retaliate

against an employee who exercises his First Amendment speech rights." McGreal at 386 F.3d at 683-684. See also Hulbert v. Wilhelm, 120 F.3d 648, 655 (7th Cir. 1997).

While this Court cannot at this stage determine if the facts of Plaintiff's case actually support relief on the grounds of the First Amendment, his complaint at least alleges enough surrounding a possible retaliation claim to survive a Fed.R.Civ.P. 12(b)(6) motion. Defendants' motion to dismiss Plaintiff's First Amendment Retaliation claim on qualified immunity grounds is DENIED.

## B. Free Exercise Claim

Plaintiff claims that Defendants interfered with his "freedom of religion" by exercising undue influence over his pastor and other church elders. Plaintiff's complaint does have enough factual information to support an allegation that Flickenger, a fellow congregant, spoke to their Pastor about Gumm. The complaint also alleges that Flickenger met with members of Gumm's church but provides no further detail regarding those meetings.[5]

As the Supreme Court noted in Anderson v. Creighton, the operation of qualified immunity depends substantially upon the level of generality at which the relevant legal right is framed. See Anderson v. Creighton, 483 U.S. 635 (1987). If plaintiffs are able to plead extremely abstract rights, the qualified immunity defense is in danger of being reduced to a rule of pleading, rather than a guarantee of immunity. See Anderson 483 U.S. at 640 ("our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be

---

[5]The complaint also states that two deacons were "asked to meet with" Plaintiff. Given the Plaintiff's use of passive voice in his complaint and lack of additional facts on the matter, this Court cannot determine who instructed the deacons to meet with Plaintiff.

sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

The Seventh Circuit, noting that the right must be "sufficiently particularized", has stated, "The words 'clearly established ... constitutional rights' may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms, so that anyone who prevails on the merits of a claim based on (for example) the First Amendment's free exercise of religion clause, however novel that claim is, can defeat the defense of immunity simply by pointing out that the right to the free exercise of one's religion has long been a clearly established constitutional right." Colaizzi v. Walker, 812 F.2d 304, 308 (7th Cir. 1987) (citing Azeez v. Fairman, 795 F.2d 1296, 1301 (7th Cir.1986)).

Plaintiff claims that congregants should be restricted in their ability to speak with religious leaders and fellow worshippers about other congregants who happen to be co-workers; such a theory does not give rise to a clearly defined right according to existing case law.

Defendants' motion to dismiss Plaintiff's Free Exercise claim on qualified immunity grounds is GRANTED. Plaintiff's Free Exercise claim is DISMISSED.

## C. Freedom of Association:

Plaintiff briefly alludes to a freedom of association claim in his complaint, claiming that defendants' actions "denied his right to association." As with his free exercise claim and his substantive due process claim, here Plaintiff does not set forth any facts to establish the contours of a recognized legal right that defendants have violated. Simply stating that Defendants have violated his "right to association" without proferring factual support is not enough when plaintiff is faced with a qualified immunity defense.

-21-

As a result, Defendant's motion to dismiss as to Plaintiff's Freedom of Association claim is GRANTED.[6] Plaintiff's Freedom of Association claim is DISMISSED.

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's entire complaint on abstention grounds is DENIED. Defendants' motion to dismiss Plaintiff's Equal Protection and First Amendment Retaliation claims on grounds of qualified immunity is DENIED. Defendants' motion to dismiss Plaintiff's Due Process, Free Exercise, and Freedom of Association claims on grounds of qualified immunity is GRANTED. Plaintiff's Due Process, Free Exercise, and Freedom of Association claims are DISMISSED.

Enter:

David H. Coar
United States District Judge

Dated: **September 29, 2004**

---

[6]Pro se pleadings are to be construed liberally. See Anderson v. Hardman, 241 F.3d 544, 545 (7th Cir. 2001). Plaintiff in this case is not proceeding pro se; neither are defendants. This Court presumes that on future substantive motions in this case, counsel will brief accordingly.