# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 8174 | **DATE** | 9/29/2004 |
| **CASE TITLE** | James Gumm vs. James Flickenger et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Scholl's motion to dismiss [12-1]

**DOCKET ENTRY:**

| | | |
|---|---|---|
| (1) | ☐ | Filed motion of [ use listing in "Motion" box above.] |
| (2) | ☐ | Brief in support of motion due _____. |
| (3) | ☐ | Answer brief to motion due_____. Reply to answer brief due_____. |
| (4) | ☐ | Ruling/Hearing on _____ set for _____ at _____. |
| (5) | ☐ | Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (6) | ☐ | Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (7) | ☐ | Trial[set for/re-set for] on _____ at _____. |
| (8) | ☐ | [Bench/Jury trial] [Hearing] held/continued to _____ at _____. |
| (9) | ☐ | This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2). |
| (10) | ■ | [Other docket entry]  Scholl's motion to dismiss [12-1] is GRANTED IN PART and DENIED IN PART. This Court will NOT DISMISS Count IV and V or Gumm's request for punitive relief on those counts. This Court will DISMISS Counts VII, VIII, and IX with respect to Scholl only; consequently, Scholl's request to deny punitive damages on those counts is MOOT. |
| (11) | ■ | [For further detail see order attached to the original minute order.] |

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | 36 |
| X | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | KT/LC courtroom deputy's initials | | date mailed notice mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES GUMM, Individually and in his Capacity as the Milton Township Assessor | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | No. 03-C-8174 HONORABLE DAVID H. COAR |
| JAMES FLICKENGER, BARBARA MURPHY, O. CHRISTOPHER HEIDORN, Individually and in Their Capacities as Milton Township Trustees, RON SMITH, CAROL SCHOLL, AND JAMES PHILLIPS | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Before this Court are is a motion to dismiss the complaint of James Gumm ("Gumm" or "Plaintiff"), filed by Carol Scholl ("Scholl" or "Defendant"). Scholl seeks to dismiss Counts IV, V, VII, VIII, and IX of Gumm's complaint. In the alternative, she requests that this Court dismiss Gumm's requests for punitive relief on those counts.[1] For reasons stated below, Scholl's motion to dismiss is GRANTED IN PART and DENIED IN PART.

This Court will not dismiss Count IV and V or Gumm's request for punitive relief on those counts. This Court will dismiss Counts VII, VIII, and IX with respect to Scholl; consequently, Scholl's request to deny punitive damages on those counts MOOT.

---

[1] Scholl's motion to dismiss is not on joined by the other defendants in this case. She asks for relief only on her own behalf.

-1-



## Factual and Procedural Background[2]

Plaintiff James Gumm first began working in the Milton Township Assessor's office in 1988. ¶8. He started as a deputy assessor and was later elected to the post of Assessor. ¶8. He began his four-year term in 1998, was re-elected, and began his second four-year term in 2002. ¶¶8-9.

As Assessor, Gumm updated the information technology in the Assessor's Office. ¶¶ 10-11. Since early 2002, the total number of employees necessary for the day-to-day operations of the Assessor's office has decreased by half, from 20 employees to 10 employees. ¶13.

When Gumm took office, there was a substantial disparity in residential and commercial assessments. ¶14. A number of commercial properties had either been under-assessed or not assessed at all. ¶14. Gumm was particularly concerned about the exemptions and underappraisals that benefitted elected officials. ¶20.

During his tenure, Gumm updated commercial assessments. ¶17. He denied Milton Township Board member James Flickinger four of the five assessment exemptions that Flickenger had been previously given. ¶19. He also denied exemptions to a number of individuals associated with Flickenger and increased the assessments of others associated with Flickenger as much as five times what they had paid in the past. ¶22.

Gumm's moves met with considerable resistance from a number of people, including local and civic political leaders who objected to the assessment corrections. ¶16. Gumm was repeatedly warned by elected officials and political leaders that his reelection would be opposed and efforts would be made to destroy him politically. ¶16.

---

[2]All facts are taken from Plaintiff's Complaint.

Flickenger, for example, participated in closed sessions of public bodies, met with members of Gumm's church to discuss the most intimate details of Gumm's life, encouraged disturbances among Gumm's employees, publicly maligned Gumm, and campaigned and voted to deny Gumm the necessary resources to do his job. ¶23.

Ron Smith, a former Milton Township Assessor who was employed by Milton Township in another capacity during the events in question, vocalized a strong interest in seeing Gumm removed from office. ¶24. Smith pursued Gumm's removal by meeting with employees from the Assessor's office and encouraging them to pursue claims for disparate treatment of one kind or another. ¶28. In 2000, he met repeatedly with employee Carol Scholl. ¶29. After Gumm took office, Smith and Scholl met several times to discuss the viability of a lawsuit against Gumm that would serve to tarnish his reputation and credibility such that he would be forced to leave office. ¶32. Smith had previously assisted Scholl in pursuing claims for sexual harassment against another individual. ¶30.

In or about August 2000, Scholl came to work wearing a t-shirt that pictured tomatoes and stated "firm." ¶156. She later complained that Gumm touched her shirt and said the word "firm." ¶ 157. Later that day, she met with a local police officer. ¶ 158. She told the officer that she had had a tape recorder in her pocket during a meeting with Gumm and that she wanted to use the recording. ¶158. The officer told her it was illegal. ¶158. When Gumm later demanded a copy of the tape, she said it she had recorded over it. ¶160. When Scholl was asked for a copy of the tape that had been "taped over" she claimed that it had been destroyed. ¶161.

In late 2000, Scholl and seven other employees in the Assessor's office prepared a claim against Gumm and another Assessor's Office employee, Larry Gage. ¶ 37. In February 2001,

Scholl filed a claim with the EEOC alleging, among other things, that she had "felt pressured for dates with Gumm." ¶33. Scholl researched the law on sexual harassment, came to work wearing provocative clothing and a hidden microphone with the intent that he would be provoked into saying or doing something that would support a claim for sexual harassment; and met with other employees in the office to convince them that they were underpaid or under-utilized on account of their gender. ¶ 35. Scholl's personal files indicate that she and Gumm were "developing a friendship." ¶34.

The complaint was lodged shortly after a meeting in which Township Board member Barbara Murphy advised the complainants on how to craft their complaint so it would be covered by the Township's insurance policy. ¶38. The employees alleged that the Assessor's Office constituted a hostile work environment and Scholl alleged that Gumm was pursuing her for dates. ¶39. The claims were asserted against the Assessor's Office and the Milton Township Board. ¶40.

The Board's retained attorney, Richard Russo, interviewed both the claimants and a number of individuals they identified as witnesses. ¶41. Russo accumulated over two dozen audio cassettes of testimony and a box of documentation regarding claims against Gumm. ¶42. The tapes revealed that many, if not all of the claims against Gumm, were completely lacking in merit or credibility. ¶44. Gumm was not told that many of the claimants had already acknowledged during their taped interviews with Russo that the claims filed with the EEOC were lacking in merit. ¶54. Scholl said during her interview that other than one instance, there had been no inappropriate touching.¶ 46. Another witness was among many who testified that she thought the allegations had been fabricated to get Gumm out of office. ¶47.

Gumm was not given access to the tapes during the investigation or its subsequent resolution. ¶43. He lodged complaints with the Township Supervisor and the Township Human Rights Consultant regarding the Board's handling of the investigation. ¶49. Freedom of information requests were made on his behalf. ¶49. He had asked that the counsel retained to represent him provide him with the documents. ¶49.[3]

Before the mediation, Gumm had repeatedly advised his counsel and the other defendants that he believed the evidence would exonerate him and that he therefore had no interest in considering the kinds of settlements that were likely to be discussed at the mediation. ¶52. Gumm vehemently denied any liability and repeatedly asked that the Board and insurer attending the mediation agree with him that the claims should be defended rather than settled. ¶51.

Over Gumm's objections, the Trustees and counsel negotiated a settlement agreement which, in part, provided for the Trustees to exercise some albeit limited authority over the Assessor's office. ¶55. Gumm was ultimately compelled to agree to settlement when one of the insurers advised him that he was placing Township assets at risk by proceeding to trial as the insurers' counsel would not continue to represent him after the mediation. ¶52. Gumm was not told that many of the claimants had already acknowledged during their taped interviews with Russo that the claims filed with the EEOC were lacking in merit. ¶54.

---

[3]The evidence of the investigation, and a later investigation, was not all disclosed to Gumm until early 2003, when a DuPage County Judge compelled production of the tapes and documents that had been withheld from him, along with other materials in possession of Scholl and the Board. ¶ 48.

The final settlement agreement contained language which Heidorn and other defendants later construed to provide the Township Board with authority over the handling of employee disputes, Gumm, and other related concerns. ¶60.[4]

In late September, 2001, Smith and Phillips attended a private meeting with the Milton Township Board. ¶61. At the meeting, Gumm's situation was discussed. ¶61. Phillips ordered Heidorn, Flickenger, and Murphy to "take care of it." ¶61. In the first week of November, 2001, Heidorn prepared the "bullet memo" which he distributed to members of the Board. ¶62. The bullet memo provided that Gumm would take no part in human resources decisions for a year, and after the year would only do so in consultation with deputy assessor Carol Lofgren and Carol Scholl. ¶63. The memo also stated that Gumm would be prohibited from terminating any employee for any reason; that employees of the Assessor's office would be free to "consult" with Heidorn rather than Gumm regarding the business of the Assessor's Office "without fear of comment or reaction" by Gumm; and that the Trustees would be free to advise the deputy assessor regarding matters involving the Assessor's Office "without interference" by Gumm. ¶63. In exchange for the concessions, the bullet memo provided specific assurance that "Ron [Smith] will cease all overt and covert activities designed to undermine" Gumm. ¶64.

On November 8, 2001, the Board held another private meeting. ¶65. All the Board members attended, as did state senator Peter Roskam, and representative Randy Hultgren. ¶65.

---

[4]Gumm later learned that there had been discussions regarding the establishment of a procedure that gave the Board even more authority over the Assessor's office than the procedure that was eventually included in the settlement agreement. ¶57. The second draft of the settlement agreement provided for the Township Board to assume the right to essentially impeach the Assessor if the Board determined that he was "guilty of covered discrimination" and provided that an employee could not be terminated for cause unless that determination was made by Trustees. ¶¶58-59.

-6-

Smith had previously consulted Hultgren about Scholl's initiation of claims against Gumm. ¶65. Gumm arrived at the meeting, which was held at Heidorn's home, expecting to attend a personal meeting with Heidorn. ¶¶65-66. At the meeting, Gumm was presented with the bullet memo and told to sign it. ¶67. He was told that if he did not sign it, the group would make a concerted effort to ruin him. ¶67. Gumm refused to sign the memo. ¶68.

On November 24, 2001, Gumm went to Phillips' office, expecting to meet with the local party leader in response to a request he had received. ¶70. He found the Board once again in a private meeting, this time with four of its five members present. ¶70. Smith, Roskam, Hultgren, and Phillips were also in attendance. ¶70. At the meeting, Phillips threatened Gumm. ¶71. He told Gumm, "We'll tell you who you can hire and fire." ¶71. He said that if Gumm didn't agree to surrender control of his office in the manner described in the bullet memo, the Board would "ruin" him in the newspapers. ¶71. Phillips demanded that Gumm stop going to the office, so that his presence would not interfere with the Trustees' control over its activities. ¶72. Phillips told Gumm, "No elected official shows up at his office everyday and you're not going to." ¶72. Roskam told Gumm "You're a convicted molester" and that his reputation would be ruined through a smear campaign and other "covert activities" if he refused to sign the bullet memo. ¶73. Gumm refused to comply with the group's demands. ¶74.

In December, 2001, the Township Board held a regular meeting. ¶75. The press was invited to the meeting and local police officers were brought in. ¶77. Gumm, who had received no notice that the meeting would affect either his personal interest or the Assessor's office, did not attend the meeting. ¶76. At the meeting, a press release prepared by Flickenger was distributed. ¶77. The press release made it clear that the Board had decided to "censure" Gumm

-7-

and had passed a "Resolution of Censure." ¶77. The release explained that the Board was taking the action so that the voting public would have "information" to use in determining Gumm's fitness to serve as Assessor. ¶77. The Board failed to disclose that there had been a settlement agreement or that it had not found any evidence from its prior investigation from which to conclude that Gumm had engaged in any wrongful conduct. ¶81. Gumm was not presented with the opportunity to present evidence on his own behalf or defend himself in any way, either during the adoption of the Resolution or at the Board meeting where the resolution was presented. ¶¶79-80. Roskam and Hultgren went with Scholl to meet with local reporters and discuss the claims against Gumm. ¶82.

After the passing of the Resolution, Scholl and other employees in the Assessor's Office openly discussed the possibility of staging work slow-downs if the office was not handled in the manner they deemed appropriate. ¶84. They threatened to resort to the Board under the auspices of the Settlement Agreement. ¶84. The Board started openly resisting Gumm's efforts to manage the office by removing the Assessor from the monthly agenda and refusing to add him to the agenda even upon his request, voting to reduce the Assessor's budget at a time when virtually no other aspect of Township government was being reduced in any manner, and continuing to engage in discussion with employees of the Assessor's office regarding their employment status and grievances against Gumm. ¶85. The discussions with employees continued to undermine Gumm's authority and disrupt the day-to-day business of the office. ¶85. Gumm's pastor was contacted and told Gumm was unstable. ¶83. Two of the deacons in his church were asked to meet with him to discuss his "problem" and need for psychological and spiritual assistance. ¶83.

In January 2002, a few weeks after the first story regarding the resolution appeared in the newspapers, Scholl provided Heidorn with a new set of claims regarding Gumm's conduct based on Gumm's alleged retaliation against her and other employees for previously bringing forth claims against him. ¶86. Heidorn asked Scholl to prepare a more "official" sounding document, reviewed the variations of this document in April and May, and then shared the document with other members of the Board in August, 2002. ¶87. Neither Heidorn nor Scholl told Gumm or the HR Coordinator for the Assessor's Office about the claims, despite being required to do so under the settlement agreement. ¶88.

On September 5, 2002, counsel for Scholl sent a written demand to Gumm, claiming that he had engaged in retaliatory conduct against Scholl in violation of both the mediation agreement and his common law duties as an employer. ¶89. Gumm agreed to an investigation of Scholl's new claims, but the Board did not initiate an investigation in compliance with the settlement agreement. ¶90. The Board did not consult the outside attorney who had been designated under the Settlement Agreement to handle such matters. ¶91. Instead, Heidorn retained the services of attorney Kevin Gustafson and subsequently paid his fees. ¶¶91-92. Heidorn told Gustafson that he thought Gumm was guilty as charged before the investigation began. ¶92.

Gumm, who objected to Gustafson's retention and did not consent to the Board making any determinations with respect to his innocence or guilt, demanded that the Township Supervisor cease and desist from any further "investigation" and any further involvement in the business of the Assessor's office. ¶93. The Board consulted with counsel, and then decided to stay any further action. ¶ 94. Gumm then demanded that the Board provide him and Scholl with copies of the tapes and documentary record from the investigation of Scholl's claims, as required

under the original settlement agreement. ¶95. The Board refused, Gumm file suit in DuPage County Court, and the Court ordered production of the documents. ¶¶ 96-97. Through his investigation, Gumm learned that Scholl had a "basement full" of documents she had taken from the Assessor's Office. ¶100. In her collection, Scholl had documents written by Smith regarding the claims against Gumm, including a document which stated that if Gumm was elected "we are stuck with him for five years!" and asked "Can he be removed from office it if is proven that he is guilty of sexual misconduct, discrimination and intimidation, etc.?" ¶101.

Scholl abandoned the mediation process in relation to her retaliation claim. ¶99. Smith eventually filed his own retaliation claim in February 2003. ¶102. Smith also continued to seek out ways to continue threatening, cajoling, and berating those who tried to work with Gumm. ¶103. He threatened employees with scriptural references to God's wrath. ¶103.

A few months ago, Gumm received another notice from the elders of his church, requesting that he "temporarily step-down" from his position as church usher until his problems, including the dispute between him and Flickenger, are resolved. ¶105.

Plaintiff filed suit in this Court on November 14, 2003.

## Legal Standard for a Motion to Dismiss

Under FRCP 8(a), a complaint generally need only set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Leatherman v. Tarrant County Narcotics Unit, 507 U.S. 163, 168 (1993). In reviewing a motion to dismiss for failure to state a claim, the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in favor of the plaintiff. See Ameritech Corp. v. McCann, 297 F.3d 582, 585 (7th Cir. 2002). If a complaint fails to allege a necessary element required to obtain relief, however, dismissal is in

order. See R.J.R. Services, Inc. v. Aetna Casualty and Sur. Co., 895 F.2d 279, 281 (7th Cir. 1989). A complaint "must at least include the operative facts upon which a plaintiff bases his claim." Lucien v. Preiner, 967 F.2d 1166, 1168 (7th Cir. 1992). When reviewing the complaint, only factual allegations will be considered, and legal conclusions which may be alleged are not binding upon the court. Reichenberger v. Pritchard 660 F.2d 280, 282 (7th Cir. 1981) (citing City of Milwaukee v. Saxbe, 546 F.2d 693, 704 (7th Cir. 1976)).

## Analysis

### Count IV

Count IV of Gumm's complaint alleges Scholl's actions in relation to Gumm constitute a breach of fiduciary duty. Given that this is a ruling on a motion to dismiss, this Court accepts Gumm's facts as true and draws all reasonable inferences from them.

Accordingly, for the purposes of this motion, this Court will assume that Scholl, an employee of the Assessor's Office, was part of a campaign to destroy Gumm. Scholl worked with the other defendants in this case to craft a meritless claim of sexual harassment against Gumm. Defendants hoped that by threatening to allege such a claim and, if necessary, eventually making the claim public, they could force Gumm to leave his post as Assessor. In connection with this plan, Scholl stole documents from the Assessor's Office—including confidential documents—and stored them in her basement. When she was in the office, Scholl spent working hours running meetings aimed at convincing other employees to join her in her false claim. She threatened to retaliate against those who did not join her in her claims. She encouraged the other employees to resist Gumm's policies and instructions, and did so herself. She also "wired"

herself and attempted to tape a conversation with Gumm without his knowledge. She later destroyed the tape.

Rather than arguing on her motion to dismiss that the aforementioned facts do not support a claim for a breach of fiduciary duty, Scholl argues that the facts in the complaint are wrong. According to Scholl, she has done nothing wrong, she was a victim of harassment, and all of her actions are protected under Title VII.

Scholl seems to be making an argument that Gumm's filing of a lawsuit against her is a form of retaliation prohibited by Title VII.[5] In order for such an argument to succeed on a motion to dismiss, however, this Court would need to accept Scholl's version of the facts as true instead of Gumm's version.[6] Scholl presents no legal authority in support of the proposition that this Court must accept a defendant's unsubstantiated version of the facts as true on a motion to dismiss.

This Court is under the obligation to accept Gumm's version of the facts as true on this motion to dismiss. As a result, Scholl's motion to dismiss Count IV is DENIED

**Count V**

---

[5] This Court presumes that Scholl is contending that the cases she cites without any further explanation in the portion of her memorandum dedicated to Count IV support a dismissal of the breach of fiduciary duty claim. Two are district court cases from the 1970s, one of which was decided in the Northern District of Georgia. The remaining case is the Supreme Court decision McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

[6] Scholl has not claimed that any judicial or agency determination has been made regarding her Title VII claims. See Henson v. CSC Credit Services, 29 F.3d 280, 284 (7th Cir. 1994)(citing United States v. Wood, 925 F.2d 1580, 1582 (7th Cir. 1991) (when analyzing motions to dismiss under Fed.R.Civ.P. 12(b)(6), the Court "may take judicial notice of matters of public record.").

Count V of Gumm's complaint alleges that Scholl violated both the Illinois Eavesdropping Statute and the corresponding federal statute, 18 U.S.C.A. §2511. Gumm claims that Scholl taped conversations she had with him on August 24, 2000. At the time, Scholl did not disclose to Gumm that she was taping their conversations. Later, after being told by a police officer that her recording was illegal, Scholl apparently destroyed the tape. The tape is important, Gumm, claims, because it establishes what happened on August 24, 2000, the day that Scholl claims Gumm physically harassed her by touching her t-shirt.

In her motion to dismiss, Scholl rightfully notes that the Illinois statute does not, for the most part, allow evidence obtained in violation of the Eavesdropping Act to be admitted into evidence against the party who was the unknowing subject of the recording. See, e.g., In re Marriage of Almquist, 704 N.E.2d 68, 71 (Ill. App. Ct. 1998) ("Section 14-5 of the eavesdropping statute provides that "[a]ny evidence obtained in violation of this Article is not admissible in any civil or criminal trial."). Illinois courts consider the statute's exclusion of evidence gathered by eavesdropping to be the legislature's express adoption of the "fruit of the poisonous tree" doctrine. The provision is aimed at preventing unwitting parties from having evidence admitted against them when the evidence was acquired by means of eavesdropping.

Scholl argues that because she is prohibited from using the recorded material against Gumm, he should not be able to use the recorded material in proceedings against her. Neither the text of the statute nor the decisions of the Illinois courts support Scholl's argument that no party--not even the one who was the victim of eavesdropping--should be allowed to use the ill-gotten recording. Scholl suggests a legal regime where a victim of eavesdropping cannot consent to the recording being played in court, but offers no legal authority in support of this proposition.

Under this theory, she claims that because Gumm is also prohibited from using the materials, he has suffered no damages from Scholl's actions.

Scholl's argument is without merit. Gumm alleges a violation of the statute and requests damages. The Illinois Eavesdropping statute explicitly includes provisions for civil damages. See IL ST CH 720 § 5/14-6 ("Civil remedies to injured parties. (1) Any or all parties to any conversation upon which eavesdropping is practiced contrary to this Article shall be entitled to the following remedies an injunction by the circuit court prohibiting further eavesdropping by the eavesdropper and by or on behalf of his principal, or either...To all actual damages against the eavesdropper or his principal or both...To any punitive damages which may be awarded by the court or by a jury...").

Scholl also takes issue with Gumm's requests for injunctive relief regarding the tape. She claims an injunction to keep her from eavesdropping is unnecessary, as she is "highly unlikely" to be presented with another opportunity to record Gumm. Based on the facts alleged in Gumm's complaint, it is feasible that an injunction may be necessary to keep Scholl from further eavesdropping on Gumm. After arguing that even Gumm cannot allow the tapes to be presented in any legal forum, Scholl also requests that this Court dismiss Gumm's request for an injunction to prevent her from relying on any representations related to the contexts of the tape or discussing what she told a police officer regarding the content on the tape. Scholl offers no legal argument for why Gumm's request for injunctive relief should be dismissed. Scholl's requests are DENIED.

Scholl again argues this Court should accept her facts rather than Gumm's when she argues that Gumm has not alleged a claim under the Federal Eavesdropping Act. The act states

that it is unlawful for parties to intercept communications where such action is take for the purpose of committing any criminal or tortuous act in violation of the Constitution, federal law, or state law. Scholl argues that she did not record because of any illegal or tortuous purpose, but it is possible to infer otherwise on the basis of Gumm's facts. As a result, her motion to dismiss on the grounds that Gumm does not allege facts sufficient to sustain a cause of action under the Federal Eavesdropping Act is DENIED.

Scholl's request to dismiss Gumm's request for punitive damages with regards to Count V is also DENIED. In short, all of Scholl's requests in relation to Count V are DENIED.

**Count VII, VIII, and IX**

Given that Gumm has not requested relief from Scholl in Counts VII, VIII and IX of his complaint, Scholl is DISMISSED as a named party in regards to those Counts.

**Conclusion**

For the foregoing reasons, Scholl's motion to dismiss is GRANTED IN PART and DENIED IN PART. This Court will not dismiss Count IV and V or Gumm's request for punitive relief on those counts. This Court will dismiss Counts VII, VIII, and IX with respect to Scholl; consequently, Scholl's request to deny punitive damages on those counts MOOT.

Enter:

David H. Coar
United States District Judge

Dated: **September 29, 2004**